## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## PECOS DIVISION

**THORNTON RANCH, LLC,**
          *Plaintiff,*

**v.**                                                    P:23-CV-00022-DC

**CONTINENTAL RESOURCES,**
**INC.,**
          *Defendant.*

## ORDER ON CONTINENTAL'S MOTION
## FOR JUDGMENT AS A MATTER OF LAW

BEFORE THE COURT is Continental Resources, Inc.'s ("Continental") oral (and renewed) motion for judgment as a matter of law.[1] In that motion, Continental seeks a ruling on two items: (1) the requested dismissal of Thornton Ranch, LLC's ("Thornton") third request for declaratory relief concerning the geographic scope of the Surface Lease Agreement's ("SLA") "exclusivity" provision, and (2) whether Thornton properly submitted to the jury evidence of its lost profits.[2]

Having considered the motion and its responses, the Court **GRANTS IN PART AND DENIES IN PART** the motion, finding that both issues are moot in light of the jury verdict. In the alternative, the Court finds that Thornton's third request for declaratory relief is **DISMISSED** and that Thornton properly submitted to the jury evidence of lost profits.

---

[1] Doc. 155 (renewed motion).
[2] *Id.* at 1.

## I.     FACTUAL BACKGROUND

Thornton Ranch is a family-owned cattle operation spanning roughly 60,000 deeded acres in Ward County, Texas.[3] Like many large ranches, it generates income by leasing surface rights and selling fresh water.[4]

This case arises from one such lease—the 2014 SLA between Thornton and Continental. That year, Thornton entered into a series of surface lease agreements with Continental's predecessor in interest and (now) subsidiary Jagged Peak Energy, LLC ("Jagged Peak").[5] The series of agreements culminated in the global SLA at issue in this case.[6]

Under the SLA, Jagged Peak and Thornton exchanged rights and obligations over approximately 7,724.59 acres located on Thornton's property (the "Leased Premises").[7] One right was Jagged Peak's ability to "use any water located on the Leased Premises."[8]  A corresponding obligation was the requirement that Jagged Peak use that water "exclusively for its operations  . . . ."[9]

The parties disagree over the geographical scope to which this "exclusivity" provision applies. Before trial, Thornton maintained that the "operations" that required exclusive use of Thornton's water included all operations *everywhere*, "regardless of the location of such

---

[3] Doc. 157, Ex. A at 46:16–21.
[4] *Id.* at 51:27-52:7.
[5] Doc. 157, Ex. P-1 at 1.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.* § H(a).

operations."[10] At trial, Thornton changed course, alleging that "operations" applied only to those operations within a five-to-ten-mile radius of the operations in place when the SLA was signed.[11] Throughout the litigation, Continental has maintained that "operations" applies only to those on the Leased Premises.

After the close of evidence at trial, Continental moved orally for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on Thornton's claims for: (1) declaratory judgment that "the Surface Lease Agreement requires Continental to use Thornton Ranch's water on all of Continental's operations regardless of the location of such operations";[12] and (2) lost profit damages resulting from Continental's alleged breach of Section H(a) of the SLA from not buying Thornton's freshwater for its operations.[13] The Court orally took the motion under advisement as to both issues, then issued a written ruling commemorating the oral ruling and soliciting additional briefing from the parties on both issues.[14]

On March 20, 2025, the jury returned its verdict, finding (among other things) that: (1) Section H(a)'s exclusivity requirement does not include Continental's operations outside the boundaries of the Leased Premises; and (2) Continental did not violate Section H(a) of

---

[10] Doc. 45 ¶ 44 (requesting Court declare SLA "requires Continental to use Thornton Ranch's water on all of Continental's operations regardless of the location of such operations.").

[11] Doc. 157-1 at 58:21-25; 136:3-6.

[12] Doc. 45 at ¶ 44(3).

[13] Doc. 155 at 1.

[14] Doc. 145.

the SLA.[15] Thornton was awarded no damages for its breach of contract claim related to lost fresh water sales.[16]

In its motion, Continental contends that in light of the verdict, the appropriate resolution of its Rule 50(a) motion is "dismissal on the grounds of mootness."[17] But, "out of an abundance of caution and solely in order to preserve its Rule 50(a) motion," Continental provided supplemental briefing and formally renewed its motion.[18] Thornton submitted additional briefing shortly after.[19]

Just after providing that briefing, Thornton moved for leave to amend its complaint to remove the third request for declaratory relief.[20] Continental opposed, agreeing that the request should be stripped from the Court's consideration, but disagreeing over the method for that resolution.[21] Continental believes that the request must "suffer . . . dismissal," rather than simply be "removed" from the Court's consideration.[22]

Before the issuance of this order, Thornton moved for a new trial, positing that the verdict and judgment "go[ ] against the great weight of the evidence."[23]

## II.    STANDARD

A motion for judgment as a matter of law is a challenge to the legal sufficiency of the evidence supporting the jury's verdict.[24] These motions are appropriate only when "a

---

[15] Doc. 149 at Questions 1a and 2b.
[16] Doc. 148.
[17] Doc. 155 at 1-2 (internal citations omitted).
[18] *Id.* at 2.
[19] Doc. 157.
[20] Doc. 158.
[21] Doc. 159.
[22] *Id.* at 2
[23] Doc. 162.

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[25]

When a court denies such a motion, the court is "considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."[26] A movant may therefore refile a renewed motion after the verdict, which may include an alternative or joint request for a new trial under Rule 59, "[n]o later than 28 days after the entry of judgment."[27]

The jury verdict must be upheld, and the motion denied, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did."[28] That verdict must be supported by "substantial evidence" in support of each element of the claims.[29]

In reviewing the evidence, a court must draw all reasonable inferences for the nonmoving party, must not make credibility determinations or weigh the evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.[30] The verdict "must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict."[31]

---

[24] *Ford v. Cimarron Ins. Co., Inc.*, 230 F.3d 828, 830 (5th Cir. 2000) (quoting *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998)) (quoting *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997)) (internal citations omitted).
[25] Fed. R. Civ. P. 50(a).
[26] *Id.* 50(b).
[27] *Id.*
[28] *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995).
[29] *Am. Home Assur. Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).
[30] *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004).
[31] *Am. Home Assur. Co.*, 378 F.3d at 487 (citing *Liberty Mut. Ins. Co. v. Falgoust*, 386 F.2d 248, 253 (5th Cir. 1967)).

### III.    ANALYSIS

The two issues for consideration are (1) the viability of Thornton's third request for declaratory relief concerning the geographic scope of the SLA's "exclusivity" provision and (2) whether Thornton properly submitted to the jury its lost profits. For the reasons discussed below, the Court finds that both issues are moot in light of the verdict. But, in the alternative, Thornton's third request for declaratory relief is **DISMISSED**, and Thornton properly submitted to the jury evidence of its lost profits.

#### A.  Both Issues are Moot.

Continental's Rule 50 motion strikes on two fronts. First, it claims that Thornton either abandoned or failed to support its third request for declaratory relief—that the "operations" governed by the SLA extend beyond the Leased Premises. Second, it contends that Thornton failed to demonstrate lost profits when it submitted evidence of only *gross* profits.

Both issues were addressed in the verdict. There, the jury found that: (1) Section H(a)'s exclusivity clause does *not* reach operations outside the Leased Premises; and (2) Continental did *not* violate Section H(a). [32]

Given the jury's clear finding that the exclusivity provision does not apply extraterritorially, the Court sees no basis to hold otherwise. Thornton asked for a declaration that would contradict the jury's verdict; it cannot have it. And because the jury also found no breach of Section H(a), Thornton's claim for lost profits—premised entirely on such a breach—is irrelevant.

---

[32] Doc. 149 at Questions 1a and 2b.

In its motion, Continental contends that in light of the verdict, the appropriate resolution of its Rule 50(a) motion is "dismissal on the grounds of mootness."[33] The Court agrees.

### B. Alternatively, Thornton's Third Request for Declaratory Relief is Abandoned or Dismissed.

Continental's first request for judgment as a matter of law concerns the geographic scope of the SLA's exclusivity clause. That provision mandates that "[Continental] shall use [Thornton]'s freshwater exclusively for its operations as long as [Thornton] is capable of supplying adequate freshwater as [Continental]'s operations demand."[34]

From day one of this litigation until trial, Thornton pressed for the broadest possible reading of that provision, alleging that the clause applied to "all of Continental's operations regardless of the location of such operations."[35] "Exclusivity," in Thornton's framing, meant just that: if Continental needed water, anywhere, it had to buy it from Thornton.[36] Plain and simple.

Continental disagreed. It maintained—and does to this day— that the exclusivity provision covered only operations on the Leased Premises, the defined tract of land contemplated in the SLA itself.

But then came trial, and with it, a major pivot. What had once been a sweeping, all-encompassing interpretation of the clause gave way to a far narrower one. No longer was the

---

[33] Doc. 155 at 1-2 (internal citations omitted).
[34] SLA § H(a).
[35] Doc. 45 at ¶ 44(3).
[36] Of course, unless Thornton could not provide all the water necessary for Continental's operations.

clause said to cover all of Continental's operations—now, Thornton claimed it reached only "five to ten miles" beyond the Leased Premises.[37]

Continental was stunned, as was the Court. To Continental, this was no mere refinement in position—it was a retreat from one of the core misunderstandings that gave rise to the dispute.[38] So stark was the shift, argues Continental, that it amounts to outright abandonment. And with no evidence offered at trial to support Thornton's original, broader theory, Continental contends that the claim for declaratory relief cannot be salvaged.[39]

Thornton concedes that its original theory was left unproven.[40] But rather than face dismissal, Thornton seeks permission to amend its complaint and withdraw the claim—quietly, without a ruling.[41] Continental objects,[42] insisting that Thornton must "suffer [the claim's] dismissal" rather than be allowed to simply remove it from the Court's consideration.[43]

The Court agrees. By pivoting so late in the game, Thornton effectively abandoned its third request for declaratory relief—after forcing both Continental and the Court to expend

---

[37] *E.g.*, Doc. 157-1 at 58:21-25; 136:3-6.

[38] Doc. 155 at 3.

[39] *Id.*

[40] Doc. 158 at 2 (conceding evidence for its prior position—the one requested in its declaratory action—was "not addressed at trial").

[41] *Id.*

[42] Doc. 159 at 1-2.

[43] *Id.* at 2. Thornton requests permission to amend its complaint through Federal Rule of Civil Procedure 15(b)(1), noting that the amendment will not cause delay; Continental will not suffer undue prejudice; Continental will not be surprised; the amendment is not futile; and the amendment would service the interests of justice and the parties' resources. Doc. 158 at 2. Continental believes pursuing this request via Rule 15(b)(1) is improper as it applies "only to *unpled* issues *tried over objection or by consent of the parties*." Doc. 159 at 2. Because the Court will not allow Thornton to amend its complaint, the Court need not consider whether Rule 15(b)(1) is applicable to this case.

considerable time and effort on it. Though, even setting abandonment aside, the outcome would be no different. Thornton offered nothing at trial to support the claim.

In the end though, the point is largely academic. The jury has already resolved the underlying issue, finding that the exclusivity provision does not extend beyond the Leased Premises.[44] But for the sake of a clean record—and in anticipation of possible appellate review—the Court has considered all avenues.

Either way, the result is the same. Thornton's third request for declaratory relief is no longer before the Court. It is dismissed as moot, or abandoned, or unsupported by evidence. Take your pick.

### C. Alternatively, Thornton Properly Submitted Evidence of Lost Profits.

Continental's second request for judgment as a matter of law posits that Thornton failed to prove lost profits at trial because it presented only evidence of gross revenue.[45] Thornton's request for lost profits is tied to Continental's alleged breach of the SLA's exclusivity provision—specifically, its failure to purchase freshwater solely from Thornton, as discussed above.

Texas law does not permit parties to recover lost profits based on gross revenue. That rule rests on a fundamental principle—that contract damages are meant to make the injured party whole, not to punish the breaching party or provide to the injured party a windfall.[46] To place that party in that position, one must subtract from the total contract

---

[44] Docs. 148, 149 at Question 1a (finding that "operations" mentioned in Sections H(a) and H(b) of SLA do not include Continental's operations outside Leased Premises).

[45] Doc. 155 at 1.

[46] *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49–50 (Tex. 1998).

price the expenses that party would have incurred through performance. What remains is the true measure of lost profits: not gross receipts, but the net benefit the contract would have produced.

That much is undisputed. Both parties agree that net profits, not gross receipts, define the proper measure of damages.[47] In fact, they even agree that Thornton introduced at trial no evidence of expenses tied to its water sales operations.[48] But Thornton insists that this omission was by design. According to Thornton, there were simply no expenses directly attributable to performance under the SLA. Thus, its claimed damages already reflect net profits.[49] But Continental isn't convinced. It characterizes Thornton's failure as a fundamental lapse in proof—not a deliberate strategy.[50]

To support their opposing views, both parties submit case law that, while generally instructive, are far from spot on.[51] Still, some general principles emerge. Those are as follows: First, lost profits must reflect net gains.[52] Second, a party may, in some cases, demonstrate that no attributable expenses exist.[53] Third, the burden rests with the plaintiff to prove the absence of such expenses.[54] Fourth, failure to meet that burden is fatal. Here, neither party disputes principles one nor two. So, only the third principle remains in dispute. The question

---

[47] *Compare* Doc. 155 at 3-4 *with* Doc. 157 at 1-2.

[48] Doc. 157 at 1-2.

[49] *Id.* at 2.

[50] Doc. 155 at 3-4.

[51] *See, e.g.*, *id.* at 3-4 (citing *Motion Med. Techs., LLC v. ThermoTek, Inc.*, 875 F.3d 765 (5th Cir. 2017); Doc. 157 at 7-8 (citing *Beneplace, Inc. v. Pitney Bowes, Inc.*, No. A-15-CV-65- LY-ML, 2016 WL 11582931, at *3 (W.D. Tex. Sept. 20, 2016)).

[52] *E.g.*, *Thermotek*, 875 F.3d at 779; *Beneplace*, 2016 WL 11582931 at *7-8.

[53] *E.g.*, *Beneplace*, 2016 WL 11582931 at *7-8.

[54] *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010).

is therefore whether Thornton carried its burden to show that no expenses were tied to performance under the SLA.

To answer that, the Court must first determine what expenses, if any, might be attributable to Thornton's performance. As noted by Continental, the relevant expenses for calculation of lost profits involve those "expenses incurred in carrying on the business," which may include "overhead and normal business operating expenses, along with the costs directly associated with the goods sold."[55] And, again, Thornton admits that such expenses exist but argues that they are not attributable to water sales under the SLA.

Continental places the relevant expenses into two categories: direct and indirect. And Thornton points the Court to *United States v. Landers*, 68 F.3d 882 (5th Cir. 1995) to distinguish between the two. As *Landers* puts it, direct expenses are those variable costs tied specifically to performing a contract—think labor, transportation, or materials.[56] Indirect expenses, by contrast, are costs that a business incurs regardless of output.[57] These include rent, loan payments, and administrative overhead—expenses that generally remain steady whether the company fulfills one contract or a hundred.[58] Continental asserts that both types of costs are implicated, but the record tells a more complicated story.

Continental, for its part, identifies only one direct expense: "those amounts associated with operating the five 'old' water wells."[59] Out of an abundance of caution, Thornton

---

[55] Doc. 155 at 4 (citing *Thermotek*, 875 F.3d at 779, n. 14).
[56] *Landers*, 68 F.3d at 882.
[57] *Id.* at 885, n. 3.
[58] *Id.*
[59] Doc. 155 at 4-5.

outlines other potential direct costs—employees, equipment, rentals, utilities, goods, maintenance, repairs, and insurance.[60] Then, one by one, it eliminates each.[61]

Labor? Disputed by trial testimony confirming that Thornton employs no one specifically for its water sales operations.[62] Equipment? Not dedicated to water sales.[63] Rent isn't a factor either, as Thornton owns the land in question.[64] Utilities—specifically electricity for the wells—are paid by Continental under the SLA, and Thornton has never borne "a single cent for electricity for any of those water wells[.]"[65] The water itself is drawn naturally from the Pecos aquifer.[66] Continental, not Thornton, pays for maintenance and repairs.[67] And insurance? Thornton carries none that is tied to its water operations.[68]

Thornton observes that Continental neither disputes the trial testimony nor offers any evidence of contrary expenses.[69] And its lone proposed direct cost—operating expenses for the older water wells—fares no better.[70] As Thornton points out, the argument defeats itself: these are not costs Thornton "would have incurred" had Continental performed under the SLA. They are costs Thornton already incurred because Continental failed to reimburse

---

[60] Doc. 157 at 12.

[61] *Id.* at 5-17.

[62] *Id.* (citing *id.*, Ex. A at 51:4-11). Tate Slaughter testified that he receives a commission for water sales. This issue is discussed in more detail below.

[63] *Id.* (citing *id.*, Ex. A at 51:12-16).

[64] *Id.* (citing Doc. 28 § III(3)(d)).

[65] *Id.* (citing *id.*, Ex. A at 50:3-9; 71:7-10).

[66] *Id.*

[67] *Id.* (citing *id.*, Ex. P-31).

[68] *Id.* (citing *id.*, Ex. A at 50:10-13).

[69] *See generally* Doc. 155.

[70] *See* Doc. 155 at 5.

them, as the agreement required.[71] To deduct those expenses now, after the fact, would amount to a double penalty.[72]

Turning to indirect costs, Continental raises a handful—legal fees, bookkeeping, CPA services—that it says should trim a damages award.[73] Thornton disagrees. These, it argues, are general overhead costs—expenses that persist regardless of whether this particular contract was performed.[74] Citing *Landers*, it contends that unless the SLA materially increased those costs, they don't belong in the lost-profits equation.[75] The Court agrees. Overhead expenses, by definition, do not fluctuate with the rise and fall of a single contract—at least not here. And when the marginal impact is negligible—as it is here—the law does not require them to be deducted.[76] But assuming such costs were relevant, Thornton addresses two of them in greater detail.

Thornton begins with commissions. At trial, Continental suggested that any damages should be reduced by the 9% sales commission owed to Tate Slaughter.[77] But as Thornton rightly notes, that commission remains a contractual obligation. It must be paid out of any recovery, just as it would have been under actual performance.[78] To deduct it now would not reflect an avoided cost—it would simply reduce Thornton's recovery and leave it worse off than if the contract had been honored. The law does not compel that result.

---

[71] Doc. 157 at 10.

[72] *Id.*

[73] Doc. 155 at 5.

[74] 68 F.3d at 884 n.2.

[75] Doc. 157 at 10, 14 (citing *Landers*, 68 F.3d at 885, n.3).

[76] *See Landers*, 68 F.3d at 885 n.3. The Court acknowledges that *Landers* is a criminal case.

[77] *E.g.*, Doc. 157-1 at 94:19-20; 108:19-23.

[78] Doc. 155 at 12

Thornton next turns to legal fees. It argues that those fees arose precisely because Continental failed to meet its obligations under the SLA—and that they would not have been incurred had Continental performed.[79] The record supports that logic.

The remaining expenses—bookkeeping, CPA services, and the like—fall into a familiar category. Thornton maintains that, even if such costs were incurred, they were not tied directly to performance under the SLA's water sales provision.[80]  And in any event, they were too immaterial to alter the bottom line. On this point too, the Court agrees.

In sum, Thornton has met its burden. It showed that the water sales contemplated under the SLA would not have required it to shoulder any additional, contract-specific expenses. Continental's objections, though not without merit, fall short of displacing that showing. Its motion for judgment as a matter of law on this issue is denied—though, as it happens, the question is now technically moot.

## IV.   CONCLUSION

Continental moves for judgment as a matter of law on two grounds: first, to dismiss Thornton's third request for declaratory relief, which concerns the geographic scope of the SLA's exclusivity provision; and second, to challenge the sufficiency of Thornton's claim for lost profits.

As to Thornton's request for declaratory relief, the Court agrees that the claim cannot proceed. At trial, Thornton abandoned its original theory in favor of a narrower interpretation and failed to offer evidence supporting its initial claim. As a result, the claim is

---

[79] *Id.* at 15-16.
[80] *Id.* at 14.

no longer properly before the Court. Whether treated as abandoned, unsupported, or rendered moot by the jury's verdict, the outcome is the same: the claim is dismissed.

As to lost profits, the Court acknowledges Continental's concern: that by failing to account for even minimal expenses related to water sales, Thornton has not adequately proven its claim for lost profits. But based on the record before it, the Court is persuaded otherwise. This case involves a single contract, and the provision at hand involves just one thing—the sale of water. Thornton has identified no labor, no transportation, and no other operational costs tied specifically to that performance. None. In short, there is no evidence that the sale of water under this agreement would have required Thornton to incur any additional expense.

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the motion. Given the current posture of the verdict, both issues presented are technically moot. Nevertheless, the Court has laid out its reasoning in full—both to provide clarity to the parties and to ensure a record of this Court's reasoning in the event of appellate review.

It is so **ORDERED**.

SIGNED this 4th day of June, 2025.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE